IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | |
|---|---|
| LINDA F. BREWER ) | |
| ) | |
| v. ) | No. 2:12-0003 |
| ) | Judge Nixon/Bryant |
| SOCIAL SECURITY ADMINISTRATION ) | |

To:  The Honorable John T. Nixon, Senior Judge

### REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. §§ 405(g) and 1383(c), to obtain judicial review of the final decision of the Social Security Administration ("SSA" or "the Administration") denying plaintiff's application for supplemental security income, as provided under the Social Security Act. The case is currently pending on plaintiff's motion for judgment on the administrative record (Docket Entry No. 14), to which defendant has responded (Docket Entry No. 20). Upon consideration of these papers and the transcript of the administrative record (Docket Entry No. 9),[1] and for the reasons given below, the undersigned recommends that plaintiff's motion for judgment be DENIED and that the decision of the SSA be AFFIRMED.

### I. Introduction

Plaintiff filed her SSI application on April 30, 2010, alleging disability since January 12, 2010, due to edema, psoriasis, spondylosis, arthritis, acid reflux, osteoporosis, and

---

[1] Referenced hereinafter by page number(s) following the abbreviation "Tr."

back fusion. (Tr. 143-48, 156-57, 161) Plaintiff's claim to benefits was denied at the initial and reconsideration stages of agency review. Plaintiff thereafter requested and received de novo hearing of her claim by an Administrative Law Judge (ALJ). The ALJ hearing was held on August 17, 2011, and testimony was received from plaintiff and from an impartial vocational expert. (Tr. 32-59) Plaintiff was represented by counsel at the hearing. At the conclusion of the hearing, the ALJ closed the record and took the matter under advisement until October 3, 2011, when he issued a written decision denying plaintiff's claim. (Tr. 19-27) That decision contains the following enumerated findings:

1. The claimant has not engaged in substantial gainful activity since April 30, 2010, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: disorders of the back, lower leg edema, left hand and arm weakness, psoriasis and a depressive disorder (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work involving the ability to occasionally climb, crouch and kneel. The claimant would need a sit/stand option. The claimant should perform no more than occasional reaching overhead with the left arm with the right hand dominant. The claimant could understand simple tasks. The claimant could interact with the general public, supervisors, and co-workers. The claimant could occasionally lift and carry twenty pounds and frequently lift and carry ten pounds out of an eight-hour workday. The claimant can stand and walk six hours and sit six hours out of an eight-hour workday.

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on August 4, 1963 and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was fiiled (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since April 30, 2010, the date the application was filed (20 CFR 416.920(g)).

(Tr. 21-22, 25-27)

On January 4, 2012, the Appeals Council denied plaintiff's request for review of the ALJ's decision (Tr. 1-4), thereby rendering that decision the final decision of the Administration. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. §§ 405(g), 1383(c)(3). If the ALJ's findings are supported by substantial evidence, based on the record as a whole, then those findings are conclusive. Id.

## II. Review of the Record

The undersigned incorporates herein the statement of facts contained in defendant's response brief (Docket Entry No. 20 at 2-8), as follows:

3

Plaintiff was seen at Cumberland Physician Group throughout the relevant time period, usually by Mehran Tavallaee, M.D., for a variety of complaints, including back and neck pain, headaches, and hand problems (Tr. 276-87, 486-92, 494-97, 552-60). On February 8, 2010, after Plaintiff complained to Dr. Tavallaee of back pain, she was sent for an x-ray of her lumbosacral spine (Tr. 286-87). The x-rays revealed post-surgical changes at the L5-S1 level, but no obvious acute bony abnormality was seen; overall, there was little change from the study of May 30, 2008 (Tr. 314). A DEXA bone density study on February 24, 2010 revealed that Plaintiff had decreased bone density in her lumbar spine, and therefore osteoporosis; it also revealed that she had osteopenia in her hips, with unchanged bone density in her right hip and slight improvement in bone density in her left hip (Tr. 313).

On April 5, 2010, after Plaintiff complained to Dr. Tavallaee of neck and back pain, Plaintiff was sent for x-rays of her cervical and thoracic spines (Tr. 280-81). X-rays of the thoracic spine showed "[q]uestionable osteoporosis" and "[p]revious granulomatous disease involving the left lung with calcified left hilar and mediastinal lymph nodes" (Tr. 310). X-rays of her cervical spine were normal (Tr. 311).

On June 1, 2010, Plaintiff complained to Dr. Tavallaee of weakness in her left hand since three weeks before (Tr. 276-77). Plaintiff was assessed with paresthesias/numbness; neck pain with radiculopathy; and headache (Tr. 276). She was sent for MRIs of her brain and cervical spine (Tr. 276-77). On June 2, 2010, the impression of the MRI of her cervical spine was as follows: "[p]robable small hemangioma in the posterior T3 vertebral body. No significant abnormality identified." (Tr. 333). The MRI of her brain revealed: "New small solitary focus of white matter increased signal in the left lower parietal upper temporal lobe anteriorly involving subcortical white matter. This is non-specific and

4

probably represents minimal chronic small vessel ischemic change that has occurred since previous exam 6/21/05. The exam is otherwise normal." (Tr. 332).

On June 15, 2010, Plaintiff saw Francisco Marasigan, M.D., at Cumberland Physician Group (Tr. 486). He noted that her head MRI showed minimal ischemic changes and assessed her with cerebral arteriosclerosis (*see* Tr. 486). Plaintiff was seen by Dr. Tavallaee again on July 9, 2010 (Tr. 487-88). Under History of the Present Illness, for Upper Back, the notes included that Plaintiff had had upper back pain for 1 week, and that she had a normal MRI (Tr. 487). Plaintiff saw Dr. Tavallaee again on July 20, 2010, complaining of, among other things, headaches and neck pain (Tr. 552-53). Dr. Tavallaee noted that the MRIs of Plaintiff's brain and neck were unremarkable (Tr. 552). Plaintiff was assessed with headache and neck pain and referred to Randy Gaw, M.D., a neurologist, for her headache and neck pain (Tr. 553).

Plaintiff underwent a psychological consultative examination with Stephen R. Hardison, M.A., on July 23, 2010 (Tr. 336-39). Mr. Hardison observed that Plaintiff had swelling in her legs (Tr. 336).

On July 26, 2010, a State agency consultant completed a Physical Residual Functional Capacity (RFC) Assessment of Plaintiff, opining that she could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk approximately six hours in an eight-hour workday; sit for approximately six hours during an eight-hour workday; and push and/or pull to the weights mentioned (Tr. 340-48). He further opined that she could frequently climb ladders, ropes, scaffolds, ramps, and stairs; balance; stoop; kneel; crouch; and crawl, and that she had no manipulative, visual, communicative, or environmental limitations (Tr. 342-44).

On September 23, 2010, Plaintiff saw Dr. Gaw for evaluation of her headaches (Tr. 434-36). Dr. Gaw noted that recent work-up included an MRI of her head, "on 6-10," which showed microvascular disease only, and an MRI of her neck, which was normal (Tr. 434). During a general physical examination, Dr. Gaw noted that Plaintiff's extremities showed no edema (Tr. 435). Plaintiff saw Dr. Gaw again on November 4, 2010, at which time Plaintiff reported improvement with medications, both in pain management and sleep (Tr. 439). She also reported that her headaches had decreased by greater than 50% (Tr. 439).

On November 8, 2010, Plaintiff complained to Dr. Tavallaee that she could not straighten her hand out, and that she had sudden onset of muscle weakness in her left upper extremity (Tr. 492). Dr. Tavallaee noted that there were only two atypical symptoms, left hand finger in contracture position and painful movement in her left hand finger, and that these two symptoms go against any CVA event(Tr. 492). Dr. Tavallaee sent Plaintiff for an MRA of the head (Circle of Willis) (Tr. 492). This was done on November 9, 2010, and revealed "[n]o significant abnormality," but "some mild plaque formation at the left bulb to takeoff ICA area" (Tr. 522). She was also sent for a bilateral carotid doppler ultrasound (Tr. 492), which was normal (Tr. 523).

A second State agency consultant completed a Physical RFC Assessment of Plaintiff on November 29, 2010, likewise opining that Plaintiff could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk approximately six hours in an eight-hour workday; sit for approximately six hours during an eight-hour workday; and push and/or pull to the weights mentioned (Tr. 372-80). However, he opined that Plaintiff had no postural limitations, as well as no manipulative, visual, communicative, or environmental limitations (Tr. 374-76).

Plaintiff saw Dr. Gaw again on April 4, 2011 (Tr. 440). She reported that she continued to have daily headaches, with perhaps three migraine headaches per month (Tr. 440). Dr. Gaw noted that Plaintiff's "general medical and neurologic exam are normal" (Tr. 440).

Plaintiff saw Celeste Stone, APN, at Cumberland Physician Group on July 6, 2011, complaining of neck, lower back, and tailbone pain (Tr. 496-97). A general examination revealed, among other things, mild edema in Plaintiff's bilateral lower extremities (Tr. 497). Plaintiff was assessed with lumbago, sacralgia, and cervicalgia, and sent for x-rays of her lumbosacral spine, cervical spine, and tailbone (Tr. 497). On July 6, 2011, no fractures, erosions, malalignment, or abnormal soft tissue swelling were identified in x-rays of Plaintiff's cervical spine (Tr. 565). X-rays of her lumbar spine on the same day revealed postoperative changes at L5-S1, but no fractures or malalignment were noted; her alignment was similar to previous films; and there were surgical clips in her upper abdomen (Tr. 566). An x-ray of her coccyx revealed the following: "No fractures demonstrated. Lower segments of coccyx are not fused. Postoperative change lumbar spine. Mild sclerosis of symphysis pubis." (Tr. 564).

At a number of visits to Cumberland Physician Group, under Review of Systems, Cardiology was negative for leg edema: March 22, 2010 (Tr. 282); April 5, 2010 (Tr. 280); April 19, 2010 (Tr. 278); June 1, 2010 (Tr. 276); June 15, 2010 (Tr. 486); July 20, 2010 (Tr. 552); November 15, 2010 (Tr. 556); February 10, 2011 (Tr. 558); June 29, 2011 (Tr. 494); and July 6, 2011 (Tr. 496). At several visits, during an examination of Plaintiff, it was noted that her extremities had no leg edema, March 22, 2010 (Tr. 282), or edema: November 15, 2010 (Tr. 557); February 10, 2011 (Tr. 559); and June 29, 2011 (Tr. 495).

7

On July 26, 2011, Plaintiff saw Steven Pribanich, M.D., to "[e]stablish care" (Tr. 498-99). Physical examination findings included good range of motion in the neck; "near full range of motion" in the upper and lower extremities; diffuse edema in the left lower leg, from the hip down to the ankle, and somewhat pitting; a "preserved" distal neurovascular exam; and normal balance and gait (Tr. 499). Dr. Pribanich assessed Plaintiff with CVA/TIA history; colon polyp history; chronic lymphedema of the left leg-stable; osteoporosis; migraine headaches; and chronic lumbago-postop (Tr. 499). He noted that she should continue her current treatment plan for osteoporosis and migraine headaches, and that her chronic lumbago was currently stable without pain medication (Tr. 499). His plan was for Plaintiff to have a mammogram and bloodwork done, and return in two weeks (Tr. 499). There are no other treatment notes from Dr. Pribanich in the record.

On August 11, 2011, Dr. Pribanich completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical) (Tr. 568-71). He opined that Plaintiff can frequently and occasionally lift and/or carry less than ten pounds; can stand and/or walk for less than two hours in an eight-hour workday; can sit less than approximately six hours in an eight-hour workday; and that Plaintiff's ability to push and/or pull were limited in her upper and lower extremities (Tr. 568-69). When asked about the medical/clinical findings that supported these conclusions, Dr. Pribanich listed Cerebral Vascular Accident (CVA); chronic lumbago, secondary to degenerative disc disease and degenerative joint disease; severe lymphedema in her left leg; and osteoporosis (Tr. 569). He also opined that Plaintiff could never climb ramps, stairs, ladders, ropes, and scaffolds; balance; kneel; crouch; crawl; and stoop, explaining that her CVA and lumbago significantly limit these activities (Tr. 569). Dr. Pribanich also stated that Plaintiff could only occasionally reach, handle, finger, and feel,

8

explaining that the CVA has affected Plaintiff's manipulative abilities and coordination (Tr. 570). He next opined that Plaintiff's speaking is limited, because the CVA has significantly affected her cognitive abilities, exacerbating her sixth grade education and illiteracy (Tr. 570). Finally, he opined that Plaintiff's CVA caused limitations in temperature extremes, noise, vibration, humidity/wetness, and hazards (Tr. 571).

At the administrative hearing, Plaintiff testified that both of her legs swell, that it has been a problem for approximately 10 years, and that the swelling is there all the time (Tr. 41, 48). When asked what she does to make the swelling feel better, she testified that she has to lay down and put her leg "up high a lot" (Tr. 41). When asked what doctors have told her to do about her feet and legs, she stated, just lay down and put them up high (Tr. 48). She explained that she spends about seven hours a day elevating her legs (Tr. 51-52). She further testified that her pain, after taking her pain medications, is a six out of ten (Tr. 51).

### III. Conclusions of Law

#### A. Standard of Review

This court reviews the final decision of the SSA to determine whether that agency's findings of fact are supported by substantial evidence in the record and whether the correct legal standards were applied. Elam ex rel. Golay v. Comm'r of Soc. Sec., 348 F.3d 124, 125 (6th Cir. 2003). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rogers v. Comm'r of Soc. Sec., 486 F.3d 234, 241 (6th Cir. 2007)(quoting Cutlip v. Sec'y of Health & Human Servs., 25 F.3d 284, 286 (6th Cir.

9

1994)). Even if the evidence could also support a different conclusion, the SSA's decision must stand if substantial evidence supports the conclusion reached. Her v. Comm'r of Soc. Sec., 203 F.3d 388, 389 (6th Cir. 1999).

## B. Proceedings at the Administrative Level

The claimant has the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." Id. at § 423(d)(3). In proceedings before the SSA, the claimant's case is considered under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

> 1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.
> 
> 2) A claimant who does not have a severe impairment will not be found to be disabled.
> 
> 3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.
> 
> 4) A claimant who can perform work that he has done in the past will not be found to be disabled.
> 
> 5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

Cruse v. Comm'r of Soc. Sec., 502 F.3d 532, 539 (6th Cir. 2007)(citing, e.g., Combs v. Comm'r of Soc. Sec., 459 F.3d 640, 642-43 (6th Cir. 2006)(en banc)); 20 C.F.R. §§ 404.1520(b)-(f), 416.920 (b)-(f).

The SSA's burden at the fifth step of the evaluation process can be carried by relying on the medical-vocational guidelines, otherwise known as "the grids," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. See Wright v. Massanari, 321 F.3d 611, 615-16 (6th Cir. 2003). Otherwise, the grids cannot be used to direct a conclusion, but only as a guide to the disability determination. Id.; see also Moon v. Sullivan, 923 F.2d 1175, 1181 (6th Cir. 1990). In such cases where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert ("VE") testimony. See Wright, 321 F.3d at 616 (quoting Soc. Sec. Rul. 83-12, 1983 WL 31253, *4 (S.S.A.)); see also Varley v. Sec'y of Health & Human Servs., 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity ("RFC") for purposes of the analysis required at steps four and five above, the SSA is required to consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. See 42 U.S.C. §§ 423(d)(2)(B), (5)(B); Foster v. Bowen, 853 F.2d 483, 490 (6th Cir. 1988).

C. Plaintiff's Statement of Errors

11

Plaintiff alleges the following errors in the decision of the ALJ: (1) that he ignored Dr. Gaw's September 23, 2010 statement that plaintiff is disabled; (2) that he incorrectly found that diagnostic testing did not reveal significant abnormalities of plaintiff's neck or back, despite radiographic evidence showing, in June 2010, a probable small hemangioma in plaintiff's thoracic spine, and in 2005 and 2007, lumbar spinal abnormalities requiring two back surgeries; (3) that he did not properly evaluate or even address in his decision plaintiff's subjective complaints of pain, in particular failing to account for her need to keep her left leg elevated for several hours throughout the day; (4) that he improperly discounted the weight of Dr. Pribanich's medical source statement, instead giving great weight to the opinions of the nonexamining state agency consultants; and, (5) that the ALJ was "hung up" on the fact that plaintiff had been denied by different ALJs on two prior applications, despite evidence that her medical condition had changed since those prior denial decisions were made. As explained below, none of these contentions has merit.

First, as to plaintiff's arguments based on the ALJ's weighing of the medical evidence: Plaintiff claims that the ALJ ignored Dr. Gaw's September 2010 opinion that plaintiff is disabled, citing the neurologist's reference to disability on the first page of his opinion letter to Dr. Tavallaee. (Tr. 434) However, as noted in defendant's response brief, the only references to disability in Dr. Gaw's letter are in describing plaintiff's past medical history of "Lumbar surgery x 2 with disability," and in reciting plaintiff's report of her own symptoms, i.e., "She reports intermittent numbness to the left hand, she is disabled and she denies bladder/bowel dysfunction. . . ." Id. These references clearly do not constitute any opinion of Dr. Gaw on the disabling severity of plaintiff's current symptoms.

12

Plaintiff next takes issue with the ALJ's statement in reference to her treatment at the Cumberland Physician group where, the ALJ noted, she was observed to have a normal gait, and where "[d]iagnostic testing did not reveal significant abnormalities of her neck or back." (Tr. 24) Plaintiff controverts this statement by reference to "a cervical MRI taken on June 2, 2010 show[ing] probable small hemangioma in the posterior T3 vertebral body," as well as prior MRI results showing the spondylolisthesis and other defects of her lumbar spine which led to her two surgeries. (Docket Entry No. 15 at 11) However, as defendant points out in its response brief, the very report upon which plaintiff's argument is based contains the radiologist's impression of "Probable small hemangioma in the posterior T3 vertebral body. **No significant abnormality identified**." (Tr. 333) (emphasis added) Also, in April 2010 and July 2011, x-rays of plaintiff's cervical spine revealed no abnormalities. (Tr. 311, 565) Furthermore, the impairments of plaintiff's lumbar spine identified in film studies in 2003, 2005, and 2007, cited by plaintiff, merely establish plaintiff's history of spinal impairment, which the ALJ readily acknowledges. However, more recent scans have consistently revealed only post-surgical changes, i.e., the instrumentation around the fused discs, but not any spinal abnormalities that were deemed significant. (Tr. 314, 424-25, 426-27, 566) Finally, with respect to a July 2011 x-ray of plaintiff's coccyx which she cites as refuting the ALJ's finding of no abnormalities on testing, that x-ray only shows mild sclerosis of the symphysis pubis, with no fracture of the coccyx; while plaintiff appears to assert as abnormal the x-ray finding that lower segments of her coccyx are unfused, that condition does not appear to be abnormal, nor was it treated as such by any physician. In fact, on the next physician visit following her coccyx x-ray, plaintiff made no mention of the region at all when reviewing her medical problems. (Tr. 498-99) In

13

short, the undersigned finds that the ALJ appropriately considered the evidence of diagnostic test results as failing to indicate any current, significant abnormality of plaintiff's neck or back.

Finally, with regard to the opinion evidence, plaintiff claims that the ALJ erred in according no significant weight to the opinion of Dr. Pribanich (Tr. 568-73), while giving greater weight to the opinions of the nonexamining state agency consultants (Tr. 340-48, 372-80). However, the ALJ gave Dr. Pribanich's opinion such weight as it was due, in light of the fact that it was most concerned with plaintiff's history of "Cerebral vascular accident with transient ischemic attacks" purportedly established in her June 2010 brain MRI (Tr. 562, 569, 572); the ALJ properly notes that neither that MRI nor any other record evidence demonstrates any recurrent ischemic attacks. (Tr. 25) Indeed, the other, treating physicians who reviewed the MRI described it as unremarkable or only minimally abnormal (Tr. 434, 486, 552), while the interpreting radiologist himself described the abnormality revealed by the MRI as "non-specific and probably represents minimal chronic small vessel ischemic change. . . ." (Tr. 562) Moreover, while a transient ischemic attack was diagnosed by Dr. Tavalllaee in November 2010 despite two atypical symptoms (Tr. 492), the subsequent brain scan did not reveal anything of clinical significance. (Tr. 522) Therefore, substantial evidence supports the ALJ's discounting of Dr. Pribanich's opinion -- which was rendered after his one and only office visit with plaintiff on this record (Tr. 572-73), and is at odds with the interpretations of plaintiff's treating physicians -- in favor of the only other assessments of plaintiff's work-related abilities and limitations in the record, given by the agency consultants.

14

As to the ALJ's analysis of plaintiff's subjective complaints of pain, while plaintiff somehow claims that the ALJ failed to address her pain complaints in his decision, it is clear that he did in fact do so. After reciting plaintiff's testimony to her symptoms at the hearing, the ALJ found that testimony to be undermined by her insignificant limitation in performing activities of daily living, and by the medical record which revealed her good response to headache and dermatologic medications, as well as clinical and radiological testing with largely normal results. (Tr. 23-24) Indeed, in his only interaction with plaintiff, on July 26, 2011, Dr. Pribanich reported normal results on range of motion and neurological testing, and assessed her chronic lymphedema of the left leg as stable, and her chronic lumbago as "currently stable without pain medication." (Tr. 573) The ALJ summarized his finding on the credibility of plaintiff's subjective complaints as follows:

> The record did not reveal that the claimant was significantly limited with regard to her ability to perform her activities of daily living or in her ability to attend to her personal needs. With regard to the claimant's skin impairment, the record revealed that the claimant experienced significant improvement. In fact, the claimant reported that her rash improved by over 50% (Exhibit 3F). Moreover, the record revealed that the claimant had a longitudinal history of vascular headaches. The record revealed that the claimant's headaches decreased by greater than 50% with the use of medication (Exhibit 21F). The claimant also reported that her lumbar disc disease and osteoporosis were stable. . . . Accordingly, the undersigned's determination that the claimant can perform a limited range of light work is fully supported by the medical record and the claimant's activities of daily living.

(Tr. 25) While plaintiff contends that the ALJ's finding of insignificant interference with her daily activities ignores her testimony to the need to elevate her left leg for several hours each day to combat her lymphedema, the ALJ clearly did not find this testimony credible. Notably, while plaintiff testified that her leg edema is there all the time, not something that

comes and goes (Tr. 48), the medical record is replete with treatment notes in which plaintiff's leg swelling is not mentioned as a complaint, and/or is specifically found to be absent (Tr. 276, 278, 280, 282, 435, 486, 494-95, 552, 556-57, 558-59). An ALJ's credibility determination is due considerable deference on judicial review, particularly since the ALJ, unlike the Court, has the opportunity to observe the plaintiff while testifying. E.g., Jones v. Comm'r of Soc. Sec., 336 F.3d 469, 476 (6th Cir. 2003). The undersigned finds substantial evidence supporting that determination in this case.

Finally, plaintiff alleges in conclusory fashion that the ALJ "was hung up on the fact that she had presented her case before two other ALJ's with both judges issuing unfavorable decisions," and that "a significant change has occurred with her medical condition to warrant a proper evaluation of her evidence." (Docket Entry No. 15 at 15) Plaintiff does not offer any citation to the record in support of this curious allegation, nor does any such "hang up" appear on the face of the ALJ's decision. Indeed, comparison of the current ALJ decision with the prior two ALJ decisions (Tr. 64-71, 75-79) reveals nothing to suggest that the decision under review here was anything other than an independent determination upon the record evidence of plaintiff's claim to disability on and after January 12, 2010, just as it purports to be. Nor is any such bias revealed in the transcript of the hearing before the ALJ, where his only reference to the prior decisions comes at the outset of the hearing, when he appears to criticize the 2010 ALJ decision for not adopting the more restrictive RFC finding from the earlier decision. (Tr. 34) Plaintiff's argument here is without merit.

16

Case 2:12-cv-00003 Document 23 Filed 01/17/14 Page 16 of 17 PageID #: 667

## IV. Recommendation

In light of the foregoing, the Magistrate Judge recommends that plaintiff's motion for judgment on the administrative record be DENIED, and that the decision of the SSA be AFFIRMED.

Any party has fourteen (14) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in which to file any responses to said objections. Failure to file specific objections within fourteen (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. Thomas v. Arn, 474 U.S. 140 (1985); Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004)(en banc).

**ENTERED** this 17th day of January, 2014.

    s/ John S. Bryant
JOHN S. BRYANT
UNITED STATES MAGISTRATE JUDGE